Richard JORDAN and Julia Jordan, Parents and Next Friends of Matthew Jordan, Petitioners,

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 91–1344V.

United States Court of Federal Claims.

March 31, 1993.

Publication Ordered June 4, 1997.

*Order and Opinion*

WEINSTEIN, Judge.

Upon consideration of the special master's decision, the record, petitioners' motion for review,[1] and respondent's response, the court affirms the decision of Special Master Laura Millman denying compensation to the petitioners, Richard and Julia Jordan, parents and next friends of Matthew Jordan, under the National Childhood Vaccine Injury Act's (Act) compensation program (Program). 42 U.S.C. §§ 300aa–10 to 300aa–33 (West 1991 & Supp.1992), Pub.L. No.99–660, tit. III, § 311(a), 100 Stat. 3758.[2]

*Facts*

The special master set out the facts in great detail in her decision.[3] They are summarized below.

Matthew Jordan was born two weeks prematurely on January 16, 1989. His head circumference, weight, and length were all below the fifth percentile. He had multiple medical problems at birth requiring oxygen treatment and surgery. Doctors noted that he had posteriorly rotated ears and slightly wide-spaced eyes. On April 3, 1989, when he was approximately three months old, he was referred to Indiana University Hospital. The medical history upon his referral showed he was born with multiple congenital abnormalities. His head size was in the third percentile for his age.

On May 25, 1989, when he was four months old, his height and weight were well below the first percentile and his mother complained to the pediatrician that he had poor head control and could not yet grasp toys. At the age of six months, his pediatrician noted that he had motor delay and could not hold his head up without it flopping. The doctor referred Matthew to an infant stimulation program.

Matthew received his third diphtheria, tetanus, pertussis (DPT) vaccination on July 20, 1989. (There is no record of any adverse reaction to any earlier vaccination.) Five days later, his mother called the doctor because Matthew had run a fever since the DPT vaccination and had experienced a seizure the evening of the vaccination. She described the seizure as a "startle reaction." These seizures gradually increased in severity. On August 7, 1989, the doctor sent a drug experience report to the DPT vaccine manufacturer stating that Matthew had experienced a "startle reaction" within four hours of receiving his third DPT vaccination. During these reactions he would stiffen and throw his arms back. The episodes lasted 1–2 seconds and occurred 1–10 times a day.

Family history shows that Matthew had a sister, Kara, who had the same dysmorphic[4] facial features, similar developmental delay, and many of the same medical problems as Matthew, including seizures. Kara died at the age of nine months. Doctors at Indiana University Hospital opined that both Matthew and Kara had a genetic disorder, proba-

---

1. Petitioners' Motion for Leave to File Overlength Memorandum, filed simultaneously with its motion for review, is allowed.

2. Section citations are to the codification of the Act, but omit 42 U.S.C. § 300aa–.

3. *Jordan v. Secretary of the Dep't of Health & Human Services,* Case No. 91–1344V, 1992 WL 300901 (Cl.Ct.Spec.Mstr., October 2, 1992).

4. "Dysmorphic" means abnormally developed. Dorland's Illustrated Medical Dictionary 518 (27ed.1988).

bly inherited in an autosomal recessive manner,[5] resulting in developmental delay and central nervous system abnormalities.

Matthew's parents filed an application for compensation under the vaccine Program, alleging that Matthew suffered an encephalopathy and residual seizure disorder within the time limits for presumptive compensable injury set out on the table appearing at § 14(a) (Table). The special master held three oral hearings at which petitioners and respondent presented expert medical testimony as to the cause of Matthew's developmental delay. After reviewing the medical records and testimony, the special master denied compensation.

The special master found that Matthew did not suffer an on-Table encephalopathy, as petitioners' own expert testified. The special master also concluded that the vaccination did not significantly aggravate Matthew's preexisting condition, so as to qualify under § 11(c)(1)(C), because petitioners' evidence did not show that Matthew's condition is worse than it would have been had he not been vaccinated (*i.e.*, based solely on his preexisting condition (the autosomal disorder)). She also found that the residual effects did not continue for more than six months, as required by § 11(c)(1)(D)(i). Finally, she determined that she could not make the finding required by § 13(a)(1)(B) because respondent had established alternative causation by a preponderance of the evidence. Either of the latter two findings is sufficient to deny compensation.

Petitioners filed a motion for review according to Vaccine Rule 23. This court has jurisdiction under § 12(e)(2).

*Standard of Review*

■ In reviewing a special master's decision under the National Vaccine Compensation Program, the United States Court of Federal Claims [6] may:

(A) uphold the findings ... and conclusions ... of the special master ...,

(B) set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, ...

Section 12(e)(2) (in pertinent part).

This standard of review is highly deferential and leaves the petitioner with a heavy burden of proof. Although there may be evidence in the record from which reasonable minds might draw different conclusions, the court may not substitute its judgment for that of the special master. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Inwood Lab. v. Ives Lab.,* 456 U.S. 844, 857–58, 102 S.Ct. 2182, 2190–91, 72 L.Ed.2d 606 (1982). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Secretary of the Dep't of Health & Human Services,* 940 F.2d 1518, 1528 (Fed.Cir.1991). Before this court may overturn the factual findings of the special master, the petitioner must show that these are unsupported by the record. *See, e.g. Munn v. Secretary of the Dep't of Health & Human Services,* 21 Cl.Ct. 345, 348 aff'd. 970 F.2d 863, 868 (Fed.Cir.1992).

Decisions have been set aside under the arbitrary and capricious standard where the special master has relied on factors that Congress has not intended to be considered, has entirely failed to consider an important aspect of the problem, or has offered an explanation of the decision that runs counter to the evidence or is so implausible it could not be ascribed to a difference in view or be a product of expertise. *Hines,* 940 F.2d at 1527 (citing *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

**5.** A genetic disorder is inherited in an autosomal recessive manner when each parent carries one recessive gene for the disorder, according to the medical testimony in this case.

**6.** The Claims Court was renamed the Court of Federal Claims on October 29, 1992, by the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516 (1992).

## Discussion

Petitioners raise three principal objections to the special master's denial of compensation. First, they argue that denying compensation is a reversible error of law, Matthew's genetic disorder not being a "factor unrelated" to the vaccine under § 13(a)(1)(B) both because genetic disorders are not listed in § 13(a)(2)(B) and because Matthew did not have one of the conditions that "shall not be considered" a table injury, under § 14(b)(3)(B). Second, they contend that the special master's adoption of the medical theory of actual alternative causation advanced by respondents—that Matthew's medical and developmental problems were due to an autosomal recessive genetic disorder that resulted in a neuromigrational disorder causing brain abnormalities—was contrary to law and arbitrary and capricious. Finally, they argue that the special master's refusal to allow oral testimony by Matthew's parents was an abuse of discretion. (Petitioners also contend generally that denial of compensation in this case is contrary to public policy.)

Section 13(a)(1) requires, as conditions for awarding compensation, that the special master or court find: "(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required ... by [ ] § 11(c)(1) ... *and* (B) that there is not a preponderance of the evidence that the ... injury ... is due to *factors unrelated* to the administration of the vaccine...." (in pertinent part, emphasis added).

Section 13(a)(2) provides (in pertinent part, emphasis added): that the term "factors unrelated to the administration of the vaccine" *does not include* "any idiopathic, unexplained, *unknown*, hypothetical, or undocumentable cause, factor, injury, illness, or condition," and *may* (if documented) *include* "infection, toxins, trauma ..., or metabolic disturbances which have no known relation to the vaccine involved, but which ... are shown to have been the agent or agents principally responsible for causing the petitioner's ... condition...."

## Six months of residual effects

At the outset, it should be noted that petitioners do not challenge the special master's finding that there was no compensable injury under § 13(a)(1)(*A*), having conceded that the six month requirement for residual effects in § 11(c)(1)(D)(i), specifically, in § 11(c)(1)(D)(i) (that he have suffered residual effects caused by his vaccination for more than six months approximately), was not met. Thus, most of petitioner's arguments in this motion for review, which go to whether the requirements of subparagraph (*B*) of § 13(a)(1) (for finding alternative causation) were met, are irrelevant, since (A) and (B) *both* must be met, and (A) concededly was not. Nonetheless, the court will address briefly the alternative causation issue.

## Alternative Causation

Petitioners argue that the disorder is "unknown" under § 13(a)(2)(A), and thus not a "factor unrelated" under § 13(a)(1)(B), because the medical experts had not previously seen this particular genetic disorder in any children other than Matthew and his sister Kara, they had not named the disorder, and they could not state with certainty which gene was defective. Petitioners, however, provided no support, either in the medical literature or in prior case law, for these propositions.

In the Jordan children's case, many medical authorities documented the condition and opined that the children suffered from a genetic disorder inherited in an autosomal recessive manner. The failure to identify the precise gene out of the over 50,000 individual genes in the human body does not make a genetic disorder "unknown" for purposes of compensation, under § 13(a)(2)(A) of the Vaccine Act. Nor does the lack of a recognized label for a particular genetic disorder make it an "unknown" cause.

Petitioners assert that the special master's finding that respondent established alternative causation was arbitrary and capricious. This finding was based on the testimony of respondent's medical experts that Matthew's current medical condition was the result of a genetic defect inherited in an

autosomal recessive manner that manifested itself in a neuromigrational disorder causing brain and central nervous system abnormalities. The special master, characterizing the case as a quintessential battle of the experts, looked to the experience, training, and qualifications of each of the three medical witnesses.

She found that the backgrounds of Drs. Rak and Raffel, witnesses for respondent, were more closely related to the medical issues involved. That finding is supported by the record: Dr. Rak is a board-certified pediatric neurologist specializing in neurophysiology and is the Director of the Sacred Heart Regional Epilepsy Center; Dr. Raffel is board-certified in pediatrics and medical genetics, and the Associate Director of the Common Disease Genetics Program at Cedar Sinai Hospital.

The record shows that the medical witness for petitioner, Dr. Kinsbourne, on the other hand, is a pediatric neurologist with a limited private practice, who is not board-certified in either neurology or genetics. Therefore, the special master's decision to accept the testimony of Drs. Rak and Raffel over that of Dr. Kinsbourne cannot be said to be arbitrary and capricious.

Petitioners also argue that respondent was required to, but did not, meet the burden of establishing that the unrelated factor *in fact* caused the injury. They argue that to establish causation in fact a respondent must meet the same standard that applies to a petitioner seeking to establish actual (off-Table) causation, *i.e.*, evidence of a medical theory causally connecting the vaccination and the injury and proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. *Hines v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 1518, 1525 (Fed.Cir.1991). (The medical theory must be supported by medical or scientific evidence. *Grant v. Secretary of Dep't of Health & Human Services*, 956 F.2d 1144, 1148 (Fed.Cir.1992) (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir.

1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984)).)

Even if the standards under the Act for demonstrating actual causation of injury by a vaccine also apply to a respondent seeking to establish that an injury was due to a factor *unrelated* to the vaccine, as decided in *McClendon v. Secretary of the Dep't of Health & Human Services,* 24 Cl.Ct. 329, 344 (1991) (applying *Hines, Grant* standard to alternative causation), the court is persuaded that respondent met that burden. Respondent's expert medical witnesses presented a theory of causation (that an autosomal defect caused Matthew's condition), and respondent entered into the record relevant excerpts from medical and scientific literature to support that theory.

### Table Exception

Petitioners also argue that, even if Matthew's genetic disorder is accepted as the cause of his condition, compensation cannot be denied because a genetic disorder is not included in the list of causative factors in § 14(b)(3)(B), which sets out exceptions to compensable on-Table injuries. In this case, however, there is no on-Table injury (or aggravation) and thus the section is inapplicable.

### Significant Aggravation

The special master applied a logical test, adopted by a judge on this court, *see Misasi v. Secretary of the Dep't of Health & Human Services,* 23 Cl.Ct. 322 (1991), in determining if any significant aggravation [7] of a preexisting condition was caused by the vaccine. The same test was used in *O'Connor v. Secretary of the Dep't of Health & Human Services,* 24 Cl.Ct. 428 (1991), *aff'd.* 975 F.2d 868 (1992). In *Misasi*, the court compared the individual's current condition with the predicted condition had the vaccine not been administered. The individual's condition had the vaccine not been administered is deter-

---

**7.** Significant aggravation is defined as "any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." Section 33(4). The Act provides that compensation shall be awarded if the person "sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table...." Sections 11(c)(1)(C)(i), 13(a)(1)(A).

mined based on the nature and extent of the individual's pre-existing condition before administration of the vaccine.

Respondent's witnesses both testified that Matthew suffered an encephalopathy in utero and had a preexisting seizure disorder, but that it was possible the DPT "triggered" or "unmasked" his seizures. These experts also testified, however, that the seizures would have occurred even without the DPT and that there was no medical evidence that the seizures themselves caused mental retardation.

Based upon the medical records and the testimony of respondent's expert witnesses, the special master found that, because of the underlying genetic disorder, Matthew would have had the same level of mental retardation even without the administration of his third DPT vaccination. Thus, she found that the vaccination did not significantly aggravate his preexisting encephalopathy, and that the seizures, which may have been triggered by the DPT, did not cause any further deterioration in his mental capacities.

*Oral Parental Testimony*

Petitioners' final assignment of error is that the refusal to allow Matthew's parents to testify orally regarding the developmental differences between Matthew and Kara prejudiced their case and was an abuse of discretion. This argument depends on the assumption that respondent's witnesses based their opinions that Matthew's congenital genetic condition was not significantly aggravated by the third DPT vaccination entirely on the

similarities between Matthew and his sister Kara. This assumption is incorrect.

While there were considerable differences, as well as similarities, between the two children, Kara's medical and developmental history clearly was only one of the factors considered by the experts in formulating their opinions, and there is no indication that this evidence was dispositive. Rather, Matthew's medical records, all of which were provided to respondent's experts before their testimony and placed in the record, showed that Matthew had many problems and already was developmentally delayed before administration of the DPT. At four months, he could not grasp toys; at six months he could not hold his head up and the pediatrician referred him to an infant stimulation program. Respondent's expert concluded that the apparent deterioration in his condition in the months following his vaccination was based on the logically increasing disparity between his developmental age and his chronological age.[8]

The special master found that the parents' testimony would add little to the proceeding because the issues were ones of medical fact and opinions based on those facts. Additionally, under the Vaccine Act, the decision whether to conduct hearings for oral testimony, or receive all or part of the testimony in written form, is left to the discretion of the special master. Section 12(d)(3)(B);[9] Vaccine Rule 8(d).[10]

More significantly, the special master actually gave petitioners ample opportunity to present their evidence, albeit not orally. The special master conducted three hearings,

---

8.  Respondent's expert explained the rationale for this conclusion as follows: Assume that when he was 6 months old chronologically, he was developmentally only 2 months old, or 4 months behind. At the same rate of development, when he is 12 months (twice as old) chronologically, he will be only 4 months (also twice as old) developmentally, or 8 months behind. At 18 months (three times as old) chronologically, he is 6 months (also three times as old) developmentally, or 12 months behind. This unfortunate pattern may make it appear that his developmental condition is deteriorating. Actually, however, while the difference between chronological and developmental age continues to expand as he gets older, the *proportion* (or rate) of chronological age to developmental age remains static (3 to 1).

There also is nothing in the records to indicate that Matthew's developmental level actually deteriorated or failed to develop at this same 3 to 1 rate.

9.  Section 12(d)(3)(B) reads (in pertinent part):

    In conducting a proceeding on a petition a special master . . .
    (v) may conduct such hearings as may be reasonable and necessary.

10.  Vaccine Rule 8(d) provides (in pertinent part): "[t]he special master may decide a case on the basis of written filings without an evidentiary hearing."

which petitioners attended and at which they could have presented their oral testimony. Petitioners made no efforts to present that testimony, orally *or* in writing, however, until the conclusion of the third hearing, when they requested a fourth hearing to allow such testimony. While Special Master Millman denied that request, she did allow submission of an affidavit from the parents, a supplemental brief, and an offer of proof. Considering the written testimony allowed by the special master and the three hearings already conducted, it was not an abuse of discretion to refuse to convene a fourth hearing to present the parents' testimony orally.

### Public Policy

■ Petitioners' public policy argument is based on an analogy to no-fault compensation legislation found in various worker's compensation statutes, in which, they claim, Congress intended to provide compensation for workplace injuries without inquiring into alternative causation. The language and legislative history of another statute cannot, however, overcome the plain language of the Act. The Act expressly requires a finding by the special master as to whether the injury was caused by a "factor unrelated to the administration of the vaccine." Nothing in the legislative history contradicts that requirement.[11] Obviously, a court cannot change the clear terms of a statute to suit one party's policy preference.

### Conclusion

The court finds that the record supports the special master's findings of fact and that her decision to deny compensation was not an abuse of discretion, arbitrary, capricious, or otherwise not in accordance with law. Accordingly, the decision of the special master is upheld.

■ Furthermore, because petitioners' motion for review did not challenge the critical finding that they failed to meet the requirement of § 11(c)(1)(D)(i) (that residual effects have been for six months after the vaccination), petitioners' other arguments to this court are irrelevant and, thus, frivolous.

**11.** H.R. 908, 99th Cong., 1st Sess., *reprinted in*

Therefore, no attorneys' fees or costs shall be permitted to petitioners in connection with the preparation of this motion. *See* § 15(e)(1).